# EXHIBIT "1"

Form H

OASIS TOWER TWO, A CONDOMINIUM

AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER.

Additionally, under certain circumstances more particularly described in paragraph 4, and provided that the Seller has posted "Alternative Assurances" with the Division of Florida Land Sales, Condominiums and Mobile Homes, Seller may use all of Buyer's deposits (including those equal to the initial 10% of the Purchase Price, as hereinafter defined).

In this Agreement, the term "Buyer" and/or "Purchaser" means or refers to the buyer or buyers listed below who have signed this Agreement. The word "Seller" and/or "Developer" means or refers to **TRG Oasis (Tower Two), Ltd., a Florida limited partnership**. If the first letter of a word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Declaration (as defined in paragraph 1 of this Agreement).

| Buyer(s): | Jose Martinez | | |
|---|---|---|---|
| Address: | 2120 SW 52nd ~~Street~~ Lane | | |
| City: | Platation | State: | Florida |
| Country: | USA | Zip Code: | 33317 |
| Home Phone: | 954-581-1545 | Office Phone: | |
| Soc Sec No.: | | Fax. No. | |
| E-Mail Address: | | Cellular Phone No. | 954-817-4816 |

1. **Purchase and Sale.** Buyer agrees to buy, and Seller agrees to sell (on the terms and conditions contained in this Agreement), Unit ___1702___, (the "Unit") in the proposed **OASIS TOWER TWO, A CONDOMINIUM** (the "Condominium"). The Unit and the Condominium are described in greater detail in the proposed Declaration of Condominium (the "Declaration") included in the Prospectus and attached exhibits (the "Condominium Documents"). Buyer acknowledges receipt of the Condominium Documents and all documents required by Section 718.503, Florida Statutes, to be furnished by a developer to a buyer, on or before the date of this Agreement. The foregoing statement shall not, however, be in lieu of the execution of a Receipt for Condominium Documents. The total purchase price for the Unit is $___443,900.00___ (the "Purchase Price"). The Purchase Price also includes the exclusive use of one parking space to be located within the Common Areas. At closing, Buyer will receive an assignment of the exclusive right to use such parking space, said space to be selected by Seller or its designee in its or their sole discretion.

2. **Payment of the Purchase Price.** Buyer agrees to make the following payments against the Purchase Price:

| Payment | Due Date | Amount |
|---|---|---|
| Initial 10% deposit | Upon execution of this Agreement | $ 44,390.00 |
| Application of Reservation Deposit (if applicable) | Upon execution of this Agreement | $ 44,390.00 |
| Balance of Initial 10% Deposit | | $ 0.00 |
| Additional Deposit | Commencement of demolition, excavation or preparation for construction (*) | $ 44,390.00 |

*Buyer will make this deposit within five (5) business days following Seller's delivery of notice to Buyer that Seller has commenced demolition of any improvements on The Properties or commenced excavation of any portion of The Properties or otherwise commenced preparing the site for construction, whether by demolition, commencing test piles or otherwise.



J.E.M

| | | |
|---|---|---|
| Additional Deposit | | $ _____ |
| Balance | Closing | $    355,120.00 |

Deposits may be made by personal check (subject to clearance), cashiers' check or wire. **The balance due at closing must be paid by either cashier's check or by wire transfer of federal funds.** All payments must be made in United States funds and all checks must be payable on a bank located in the Continental United States. Even though Seller is not obligated to do so, if Seller accepts a deposit from Buyer by credit card and/or drawn on a foreign bank and/or payable in a currency other than U.S. currency, Buyer shall be solely responsible for all costs of collection and/or conversion and agrees to pay same to Seller promptly upon demand or, in Seller's sole and absolute discretion, Seller may permit such costs to be charged to Buyer at the time of closing. If Buyer fails to pay any deposit on time, and Seller agrees to accept it on a later date (which Seller is not obligated to do), Buyer will pay a late funding charge equal to interest on such deposit at the then applicable highest lawful rate from the date due until the date received and cleared by Seller.

Buyer also agrees to pay all costs and other sums required to be paid by Buyer in this Agreement. At the present time, the costs for which dollar amounts can be computed are:

(a) $ 7,546.30 - 1.70% Development Fee

(b) $ 955.42 - Initial Contribution to the Condominium Association and the Master Association

These charges are subject to change as provided in paragraph 11 of this Agreement and are explained in more detail in that paragraph, as are other costs which cannot be computed at this time.

3.  <u>How Buyer Pays</u>. Buyer understands and agrees that Buyer will be obligated to pay "all cash" at closing. This Agreement and Buyer's obligations under this Agreement to purchase the Unit will not depend on whether or not Buyer qualifies for or obtains a mortgage from any lender. Buyer will be solely responsible for making Buyer's own financial arrangements. Seller agrees, however, to cooperate with any lender Buyer chooses and to coordinate closing with such lender, if, but only if, such lender meets Seller's closing schedule and pays Seller the proceeds of its mortgage at closing. In the event that lender does not pay Seller these proceeds at closing, and if Seller allows same (which it is not obligated to do), Buyer will not be allowed to take possession of the Unit until Seller actually receives the funds and they have cleared. Notwithstanding any cooperation provided by Seller, nothing herein shall be deemed to qualify or otherwise condition Buyer's obligation to close "all cash" on the purchase of the Unit.

Although Seller does not have to do so, if Seller agrees to delay closing until Buyer's lender is ready, or to wait for funding from Buyer's lender until after closing, or to accept a portion of the sums due at closing in the form of a personal check, Buyer agrees to pay Seller a late funding charge equal to interest, at the then highest applicable lawful rate on all funds due Seller which have not then been paid to Seller (and, with regard to personal checks, which have not then cleared) from the date Seller originally scheduled closing to the date of actual payment (and, with regard to personal checks, to the date of final clearance). This late funding charge may be estimated and charged by Seller at closing. Seller's estimate will be adjusted after closing based on actual funding and clearance dates upon either Seller's or Buyer's written request. Without limiting the generality of paragraph 32 of this Agreement, the foregoing sentence will survive (continue to be effective after) closing.

4.  <u>Deposits</u>. Except as permitted below or by the provisions of the Florida Condominium Act, all of Buyer's deposits will be held in escrow by Chicago Title Insurance Company ("Escrow Agent"), with offices at 2701 Gateway Drive, Pompano Beach, Florida  33069, in accordance with the escrow agreement contained in the Condominium Documents. The escrow agreement is incorporated into this Agreement as if repeated at length here, and Buyer agrees that the deposits may be held in any depository which meets the requirements of the Act, including, without limitation, a financial institution chartered and located out of the State of Florida.

Buyer agrees that all of Buyer's deposits in excess of ten percent (10%) of the Purchase Price may be used by Seller for construction and development purposes as permitted by law. In addition to the foregoing, if Seller has obtained or obtains the approval of the Director of the Division of Florida Land Sales, Condominiums and Mobile Homes to provide "Alternative Assurances", as permitted by law, in lieu of holding deposits up to ten percent (10%) of the Purchase Price in escrow, Seller may cause the Escrow Agent to disburse such deposits to it for all uses permitted by law. If Seller has obtained such approval as of the date of this Agreement, a copy of the Escrow Agreement providing the mechanism for such disbursement has been delivered to Buyer. If such approval is obtained after the date of this Agreement, Buyer will be provided with a copy of the Escrow Agreement, but Buyer agrees that it shall not be deemed a material or adverse change in the offering of the Condominium by reason of the fact that Buyer has already agreed to the use of Buyer's deposits up to ten percent (10%) of the Purchase Price in the manner stated above.

*JEM*

If Buyer so requests, Buyer may obtain a receipt for Buyer's deposits from the Escrow Agent. Seller may change escrow agents (as long as the new escrow agent is authorized to be an escrow agent under applicable Florida law), in which case Buyer's deposits (and any interest actually earned on them) may be transferred to the new escrow agent at Seller's direction. At closing, all deposits not previously disbursed to Seller will be released to Seller. **Except where expressly provided herein to the contrary or otherwise required by law, all interest earned on Buyer's deposits shall accrue solely to the benefit of Seller, and shall not be credited against the Purchase Price of the Unit.** Buyer further understands and agrees that to the extent that deposit monies are used for construction purposes, said monies are not available for investment and accordingly no interest shall be earned or deemed to be earned (even if Seller indirectly benefits from the use of said funds). No interest will be assumed to be earned, unless in fact said sums are invested in an interest bearing account and do in fact earn interest.

5.  Seller's Financing. Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium. Buyer agrees that any lender advancing funds for Seller's use in connection with the Condominium will have a prior mortgage on the Unit and the Condominium until closing. At closing, Seller shall cause the then applicable mortgages to be released and may use Buyer's closing proceeds for such purpose. Neither this Agreement, nor Buyer's payment of deposits, will give Buyer any lien or claim against the Unit, the Condominium or the real property upon which the Condominium is being developed. Without limiting the generality of the foregoing, Buyer's rights under this Agreement will be subordinate to all mortgages (and all modifications made to those mortgages) affecting the Unit or the Condominium (or the real property upon which the Condominium is being developed) even if those mortgages (or modifications) are made or recorded after the date of this Agreement.

6.  Insulation; Energy Efficiency. Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Unit, the following insulation: (a) no insulation on interior walls of concrete block between Units; (b) as to all other interior walls between Units, type X insulation, having an R-Value of R-11 and (c) lightweight insulating concrete on the roof, having an average R-Value of R-10 and of a varying thickness. This R-value information is based solely on the information given by the appropriate manufacturers and Buyer agrees that Seller is not responsible for the manufacturers' errors.

To the extent required by applicable law, each buyer may have the Condominium building's energy efficiency rating determined. In accordance with the provisions of applicable law, upon the completion and certification of an energy performance level display card for the Condominium building, such card shall be forwarded to the Buyer and deemed incorporated in this Agreement. Buyer acknowledges receipt of the Department of Community Affairs' brochure regarding energy efficiency ratings. All insulation and energy efficiency rating information is subject to Seller's general right, under paragraphs 14, 27 and 29, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.  Completion Date; Presale Contingency. Seller estimates it will substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than December 31, 2010, subject, only to extensions resulting from "Force Majeure" (as same may be extended by Force Majeure, the "Outside Date"). The term "Force Majeure" as used in this Agreement shall mean "Acts of God", labor disputes (whether lawful or not), material or labor shortages, restrictions by any governmental or utility authority, civil riots, floods or other causes beyond Seller's control. Notwithstanding the foregoing or any other contrary provision of this Agreement, Seller shall have the right, in Seller's sole discretion, to cancel this Agreement and cause Buyer's deposits to be refunded in the event that Seller does not enter into binding contracts to sell at least ninety five percent (95%) of the Units in the Condominium. Seller must, however, notify Buyer of such a termination within one (1) year following the date of this Agreement, otherwise Seller will be required to construct the Condominium and the Unit and otherwise proceed to perform its obligations under this Agreement. The foregoing presale contingency is a provision solely for the benefit of Seller, and may be waived unilaterally by Seller. Accordingly, Seller may elect to proceed with the construction of the Condominium and to remain bound by the terms of this Agreement, whether or not the stated presales threshold has been met. In the event that Seller does elect to proceed without having met the threshold, Buyer will have no right to object thereto and shall remain bound by the terms of this Agreement. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this paragraph, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to meet the foregoing pre-sale requirement.

Notwithstanding anything to the contrary contained in this Agreement, Buyer understands and agrees that the Seller has submitted a revised site plan for the development of the Land which has not yet been approved by the appropriate authorities (the "Site Plan Approval"). Accordingly, Buyer expressly understands and agrees that Seller's obligations to construct the Condominium and to convey the Unit to Buyer are expressly contingent and conditioned upon Seller obtaining the Site Plan Approval prior to March 31, 2006. In the event that Seller does not obtain the Site Plan Approval prior to March 31, 2006, then Seller shall have no obligation to construct the Condominium, and shall have the right, unilaterally and in its sole discretion, to cancel this Agreement and cause Buyer's deposits to be refunded. Seller must, however, notify Buyer of such a termination no later than April 30, 2006, otherwise Seller will

be deemed to have waived it's right to terminate this Agreement pursuant to the contingency set forth in this paragraph. Buyer further understands and agrees that the contingency set forth in this paragraph is separate and apart from the presale contingency set forth in the previous paragraph and that unless and until Seller timely obtains the Site Plan Approval, and either waives or meets the presale contingency as aforesaid, there is no guarantee that the Condominium will be built. This paragraph shall not delay the effectiveness of this Agreement, which shall be immediate, but, rather, shall be deemed a "condition subsequent" to this Agreement. In the event of Seller's termination of this Agreement pursuant to this paragraph, upon such termination and the return of Buyer's deposits, Seller and Buyer will be fully relieved and released from all obligations and liabilities under and in connection with this Agreement. Seller agrees to use its good efforts to obtain the Site Plan Approval.

8.  Inspection Prior to Closing. Buyer will be given an opportunity prior to closing, on the date and at the time scheduled by Seller, to inspect the Unit with Seller's representative. At that time, Buyer will sign an inspection statement listing any defects in workmanship or materials (only within the boundaries of the Unit, itself) which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards applicable in Lee County, Florida for similar property), Seller will be obligated to correct those defects at its cost within a reasonable period of time after closing, but Seller's obligation to correct will not be grounds for deferring the closing, nor for imposing any condition on closing. **No escrows or holdbacks of closing funds will be permitted.** Buyer understands and agrees that Seller's obligation to correct defects in the Unit noted during the pre-closing inspection shall automatically terminate (with Seller having no further obligations for the repair of such items) upon the earlier of: (i) the date that Buyer obtains a permit for construction and/or improvement of the Unit, or (ii) the date that Buyer commences construction and/or improvement of the Unit, whether or not a permit has been obtained. If Buyer fails to take advantage of the right to a pre-closing inspection on the date and time scheduled, Seller will not be obligated to reschedule an inspection prior to closing and Buyer shall be deemed to have accepted the Unit in its AS-IS condition. Similarly, if Buyer refuses to sign the inspection statement during Buyer's pre-closing inspection, Seller shall have no obligation to repair any defects noted in the Unit and Buyer shall be deemed to have accepted the Unit in its AS-IS condition.

From and after the closing, Buyer hereby grants Seller and its agents access to the Unit at reasonable times during normal business hours to complete any necessary repairs to the Unit. If Buyer cannot be present at the time such work is to be performed to facilitate completion of such work, Buyer hereby authorizes Seller, its agents, employees and contractors to enter the Unit for such purposes using a master key or a key maintained by the Association. If Buyer cannot or elects not to be present at the time that Seller performs any such work, Buyer hereby waives and releases Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) from any and all claims that Buyer may have against Seller (its partners, contractors, subcontractors, employees, agents, designees and assigns) relating to damage to or theft of property from the Unit that is not due to the negligence or intentional act of Seller or its partners, contractors, subcontractors, employees, agents, designees and/or assigns. Seller shall have no further obligation to complete punch list items if Seller has submitted three (3) written requests to Buyer for entry over a thirty (30) day period after closing, and access to the Unit has been denied for any reason.

Buyer acknowledges that all matters pertaining to the initial construction of the Unit will be handled by Seller and Seller's representatives. Buyer agrees not to interfere with or interrupt any workers at the site of the Unit. No personal inspections (other than the one pre-closing inspection) will be permitted. Buyer may not commence any work on the Unit, other than prepaid options or extras that Seller agrees in writing to provide, until after closing. **Buyer recognizes that Seller is not obligated to agree to provide extras or options.**

Buyer can examine Seller's Plans and Specifications at Seller's business office, located on site during regular business hours by making an appointment to do so in advance.

9.  Buyer understands that Seller has the right to schedule the date, time and place for closing, which shall in no event be scheduled later than one (1) year following the Outside Date.

Before Seller can require Buyer to close, however, two things must be done:

(a) Seller must record the Declaration and related documents in the Lee County public records; and

(b) Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be occupied), but, subject and subordinate to the provisions of paragraphs 8 and 33 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and other portions of the Condominium Property and the Common Areas of the Master Association need not then have certificates of occupancy, nor be completed, provided, however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded. Seller does, however, agree to complete those amenities, roads, streets and facilities for water,

sewer, gas, and electric service within a reasonable time following closing and otherwise in accordance with the terms of the Property Report dated as of 6/24/2005.

Buyer will be given at least ten (10) days' notice of the date, time and place of closing, except in the event that Buyer's lender, if any, requires closing to be held on less than ten (10) days' notice, in which event, Buyer shall close upon demand of Buyer's lender. Seller is authorized to postpone the closing for any reason and Buyer will close on the new date, time and place specified in a notice of postponement (as long as at least three (3) days' notice of the new date, time and place is given). A change of time or place of closing only (one not involving a change of date) will not require any additional notice period. Any formal notice of closing, postponement or rescheduling may be given by Seller orally, by telephone, telegraph, telex, telecopy, mail or other reasonable means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the information specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be effective on the date given or mailed (as appropriate). An affidavit of one of Seller's employees or agents stating that this notice was given or mailed will be conclusive.

After the notice is given or mailed, and if requested in writing by Buyer, Seller will send a written confirmation of the closing, together with a draft closing statement and other pertinent information and instructions. This written confirmation is given merely as a courtesy and is not the formal notice to close. Accordingly, it does not need to be received by any particular date prior to closing. Buyer agrees, however, to follow all instructions given in any formal notice and written confirmation.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address or phone, telecopy or telex number, because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date.

If Seller agrees in writing to reschedule closing at Buyer's request, or if Buyer is a corporation or other entity and Buyer fails to produce the necessary documentation Seller requests and, as a result, closing is delayed, or if closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the Purchase Price not then paid to Seller (and cleared), from the date Seller originally scheduled closing to the date of actual closing. Except only as may result from delays desired, requested or caused by Seller, all prorations will be made as of the originally scheduled closing date. **Buyer understands that Seller is not required to reschedule or to permit a delay in closing at Buyer's request.**

10. <u>Closing</u>. The term "closing" refers to the time when Seller delivers the deed to the Unit to Buyer and ownership changes hands. Buyer's ownership is referred to as "title". Seller promises that the title Buyer will receive at closing will be good, marketable and insurable (subject to the permitted exceptions listed or referred to below). Notwithstanding that Buyer is obligated to pay "all-cash" hereunder, in the event that Buyer obtains a loan for any portion of the Purchase Price, Buyer shall have the right to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, or Buyer may elect to have Seller's closing agent issue the title insurance commitment and policy, in accordance with terms set forth in Section 11 below.

In the event that Buyer elects to obtain a title insurance commitment and policy for the Unit from its own sources rather than to receive same from Seller, (i) Buyer shall provide Seller with written notice of same ten (10) business days prior to the originally scheduled closing date, (ii) Seller shall have no obligation to provide a title insurance commitment or policy, or any other evidence of title to Buyer and (iii) Buyer shall, no later than five (5) business days prior to closing (the "Objection Deadline"), notify Seller in writing if title is not in the condition required by this Agreement and specify in detail any defect (i.e., any matters which make title other than in the condition pursuant to which same is required to be conveyed to Buyer), provided that if Buyer fails to give Seller written notice of defect(s) before the expiration of the Objection Deadline, the defects shall, anything in this Agreement notwithstanding, be deemed to be waived as title objections to closing this transaction and Seller shall be under no obligation whatsoever to take any corrective action with respect to same, and title to the Unit shall be conveyed subject to same.

Buyer will receive two (2) documents at closing which Buyer agrees to accept as proof that Buyer's title is as represented above:

(a) <u>A written commitment</u>, whether provided by Seller's closing agent or otherwise, from a title insurance company licensed in Florida agreeing to issue a policy insuring title or the policy itself. This commitment (or policy) will list any exceptions to title. Permitted exceptions (exceptions which Buyer agrees to take title subject to) are:

   (i) Liability for all taxes or assessments affecting the Unit starting the year Buyer receives title and continuing thereafter;

(ii) All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements now or hereafter recorded in the public records, which may include, without limitation, zoning restrictions, property use limitations and obligations, easements (rights-of-way) and agreements relating to telephone lines, water and sewer lines and other utilities, provided, however, that none of such matters shall impair the marketability of title;

(iii) The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Condominium Documents (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded, now or at any time after the date of this Agreement, in the public records;

(iv) The restrictions, covenants, terms and other provisions contained in the Declaration of Covenants, Restrictions and Easements for Oasis recorded, or to be recorded, in the Public Records of Lee County, Florida, as amended and supplemented from time to time (the "Master Covenants") and/or in the Articles of Incorporation, By-Laws and/or Rules and Regulations of the Oasis Ft. Myers Master Association, Inc. (the "Master Association");

(v) The terms, conditions and obligations set forth in the Ordinance;

(vi) Rights of ingress and egress over and across any and all roads and/or sidewalks contained within The Properties;

(vii) Rights of the employees, suppliers, delivery personnel, customers, clients and patrons of any Commercial Lot over and across the Common Areas, all as more particularly provided for in the Master Covenants.

(viii) Pending governmental liens as of closing (Seller will be responsible, however, for certified governmental liens or special assessment liens as of closing, provided, however, that to the extent that any such certified liens are then due or are payable in installments, Seller shall only be responsible for those payments and/or installments due prior to closing, and Buyer hereby assumes all payments and/or installments coming due after closing);

(ix) All standard printed exceptions contained in an ALTA Owner's title insurance policy issued in Lee County, Florida;

(x) Standard exceptions for water-front property and artificially filled-in property which once was in navigable waters and all other standard exceptions for similar property; and

(xi) Any matters not listed above as long as affirmative title insurance is given for these matters and same do not render title unmarketable or uninsurable.

Buyer understands, however, that no limitation on Buyer's title prohibits construction of the Unit, nor the use of it as a residence, subject to the Condominium Documents.

(b) <u>A Special Warranty Deed</u>. At closing, Seller promises to give Buyer a special warranty deed to the Unit. The special warranty deed will be subject to (that is, contain exceptions for) all of the matters described above.

Buyer will also receive at closing a bill of sale for any appliances included in the Unit, and Seller's form of owner's ("no lien") affidavit, closing agreement, and FIRPTA (non-foreign) affidavit and an assignment of the exclusive use of any appurtenances to the Unit. When Buyer receives the special warranty deed at closing, Buyer will sign Seller's closing agreement, a settlement statement and all papers that Seller deems reasonably necessary or appropriate for transactions of this nature.

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title. If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) to correct the title defects, Buyer will have two options:

a. Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit. Buyer will not make any claims against Seller because of the defects; or

b.  Buyer can cancel this Agreement and receive a full refund of Buyer's deposits. Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

At the same time Buyer receives the special warranty deed, Buyer agrees to pay the balance of the Purchase Price and any additional amounts owed under this Agreement. Until all sums have been received and cleared, Seller will be entitled to a vendor's lien on the Unit (which Buyer agrees Seller may unilaterally record in the Public Records of the County). This paragraph will survive closing.

11. <u>Costs and Fees</u>. Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing. These include:

(a) A "development fee" equal to one and seven tenths percent (1.70%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price). This fee will be used, in part, to pay for the following closing costs: (i) the costs of officially recording the deed in the Public Records of the County (presently, recording fees are $10.00 for the first page of an instrument and $8.50 for each additional page), (ii) the documentary stamp taxes payable in connection with the deed conveying the Unit to Buyer (presently, documentary stamp taxes are $.70 for each $100.00 of consideration), and (iii) for the premium on the owner's title insurance policy, at the minimum promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any), whether obtained from Seller's closing agent, or elsewhere. The balance of the "development fee" shall be retained by Seller as additional revenue and to offset certain of its construction and development expenses, including without limitation, certain of Seller's administration expenses and Seller's attorneys' fees in connection with development of the Condominium. Accordingly, Buyer understands and agrees that the development fee is not for payment of closing costs or settlement services (other than to the extent expressly provided above), but rather represents additional funds to Seller which are principally intended to provide additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller associated with development of the Condominium. In the event of increases in either the recording fees imposed by the County, the documentary stamp tax rates or the minimum risk title insurance premiums, subsequent to the date of this Agreement, or in the event of the imposition of any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to pay all such increases, surcharges or new taxes or charges, in addition to the development fee.

(b) A working capital contribution in an amount equal to the aggregate of twice the monthly maintenance charge owed to the Condominium Association and the Master Association, which charges are payable directly to the respective Associations to provide them with initial capital for the intended purpose of establishing initial operating funds and working capital and for initial, non-recurring expenses. Notwithstanding the foregoing intent, however, all contributions may be used by the Associations for any purpose. These contributions will not be credited against regular assessments. Assuming no change in the current regular periodic assessments for the Unit, these charges will be in the amount shown in paragraph 2 of this Agreement. These charges may change, however, if the applicable monthly assessments change prior to closing (see paragraph 17).

(c) A reimbursement to Seller for any utility, cable or interactive communication deposits or hook-up fees which Seller may have advanced prior to closing for the Unit. The amount of this charge is now unknown.

(d) Any charge for any options or upgrading of standard items included, or to be included, in the Unit as agreed to in writing by both Buyer and Seller.

(e) Reimbursement to Seller, and/or Seller's closing agents, for charges incurred in connection with coordinating closing with Buyer and/or Buyer's lender, including, without limitation, charges for messenger expenses, long distance telephone calls, photocopying expenses, telecopying charges and others.

In addition, if Buyer obtains a loan for any portion of the Purchase Price, Buyer will be obligated to pay any loan fees, closing costs, escrows, appraisals, credit fees, lender's title insurance premiums, prepayments and all other expenses charged by any lender giving Buyer a mortgage, if applicable. Additionally, if Buyer obtains a loan and elects to have Seller's closing agent act as "loan" closing agent as well, Buyer agrees to pay, in addition to any other sums described in this Agreement, such closing agent an aggregate sum equal to $795.00, for a simultaneously issued mortgagee's title insurance policy, the agent's title examination, title searching and closing services related to acting as "loan closing agent". In addition to that sum, Buyer shall be obligated to pay the

premiums (at promulgated rate) for any title endorsements requested by Buyer's lender. Buyer shall not, however, be obligated to use Seller's closing agent as Buyer's loan closing agent, and if Buyer elects to use another agent, Buyer will not be obligated to pay to Seller's closing agent the amounts described in this paragraph (although Buyer will be obligated to pay to Buyer's loan closing agent such fees and expenses as are agreed to by Buyer and that closing agent). Notwithstanding any of the references in this paragraph to coordinating closing with any lender that Buyer may elect to obtain, nothing herein shall be deemed to make the Agreement, or the Buyer's obligations under the Agreement, conditional or contingent in any manner on the Buyer obtaining a loan to finance any portion of the Purchase Price; it being the agreement of the Buyer that the Buyer shall be obligated to close "all cash".

Current expenses of the Unit (for example, taxes and governmental assessments, levies and/or use fees and current monthly assessments of the Association and the Master Association and any interim service fee imposed by governmental authority) will be prorated between Buyer and Seller as of the date of closing. Additionally, at closing, Buyer shall be obligated to prepay the next month's maintenance assessment to the Association and the Master Association. These prepayments are in addition to Buyer's obligation to pay the working capital contributions, as described above. If taxes for the year of closing are assessed on the Condominium as a whole, Buyer shall pay Seller, at closing, the Unit's allocable share of those taxes (as estimated by Seller and subject to reproration when the actual tax bill is available) for the Unit from the date of closing through the end of the applicable calendar year of closing. If taxes for the year of closing are assessed on a unit-by-unit basis, Buyer and Seller shall prorate taxes as of the closing date based upon the actual tax bill, if available, or an estimate by Seller, if not available, with Buyer responsible for paying the full amount of the tax bill and Seller reimbursing Buyer for Seller's prorated share of those taxes. Buyer agrees that Seller's prorated share of the taxes due as of closing need not be paid to Buyer, however, until the actual tax bill is presented to Seller, and any proration based on an estimate of the current year's taxes shall be subject to reproration upon request of either party, provided, however, that any request for reproration is made within six (6) months following the issuance of the actual tax bill for the Unit (it being assumed, for purposes hereof, that tax bills are issued on November 1 of each tax year). No request for proration beyond the six (6) month period shall be honored. In addition, Buyer shall pay, or reimburse Seller if then paid, for any interim proprietary and/or general service fees imposed by any governing municipality or governmental authority having jurisdiction over the Unit. This subparagraph shall survive (continue to be effective after) closing.

12. **Adjustments with the Associations.** Buyer understands that Seller may advance money to either, or both, of the Associations to permit them to pay for certain of their expenses (for example, but without limitation, insurance premiums, common element or Common Areas utility and/or cable or other interactive communication charges and deposits, permit and license fees, charges for service contracts, salaries of employees of the Associations and other similar expenses). Seller is entitled to be reimbursed by the applicable Association for all of these sums advanced by Seller. The applicable Association will reimburse Seller out of initial contributions and regular assessments paid by Buyer and other owners as those contributions and assessments are collected, or as otherwise requested by Seller. Seller also, at its election, may receive reimbursement for these payments by way of a credit against any sums it may become obligated to pay to the Associations.

13. **Default.** If Buyer fails to perform any of Buyer's obligations under this Agreement (including making scheduled deposits and other payments) Buyer will be in "default". If Buyer is still in default twenty (20) days after Seller sends Buyer notice thereof, Seller shall be entitled to the remedies provided herein

Upon Buyer's default (and the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Seller can resell the Unit for a higher or lower price without any accounting to Buyer. Buyer understands that because Seller has taken the Unit off the market for Buyer, has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement because of Buyer's default, Buyer authorizes Seller (subject to the limitation provided below) to keep (or if not then paid by Buyer, Buyer will pay to Seller), as Seller's sole and exclusive remedy, all deposits and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages (and not as a penalty). If Buyer defaults after fifteen percent (15%) of the Purchase Price, exclusive of interest, has been paid, Seller will refund to the Buyer any amount which remains from the payments Buyer made after subtracting fifteen percent (15%) of the Purchase Price, exclusive of interest. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages. Buyer and Seller agree to this because there is no other precise method of determining Seller's damages.

If Seller defaults under this Agreement, Buyer will give Seller twenty (20) days notice of it and if Seller has not cured the default within such period, Buyer will have such rights as may be available in equity and/or under applicable law, provided, however, that absent an intentional and willful default, Buyer may not be permitted to seek specific performance of this Agreement.

This provisions of this Section 13 will survive (continue to be effective after) closing.

14. <u>Construction Specifications</u>. The Unit and the Condominium will be constructed in substantial accordance (in Seller's opinion) with the plans and specifications therefor kept in Seller's construction office, as such plans and specifications are amended from time to time. Seller may make such changes in the plans and specifications that it deems appropriate at any time, to accommodate its in the field construction needs (as more fully discussed in this Section 14) and in response to recommendations or requirements of local, state or federal governmental or quasi-governmental agencies or applicable utility and/or insurance providers. Such plans and specifications, as they are so amended, are referred to in this Agreement as "Seller's Plans and Specifications". Without limiting Seller's general right to make changes, Buyer specifically agrees that the changes described above and changes in the dimensions of rooms, patios and balconies, in the location of windows, doors, walls, partitions, utility (including, but not limited to, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes, and in the general layout of the Unit and Condominium, may be made by Seller in its discretion. In furtherance of the understanding and agreement stated above, Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction needs. These changes and adjustments are essential in order to permit all components of the Unit and the Building to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Because of the foregoing, Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller the flexibility to make such changes in the Unit and the Condominium. Buyer further acknowledges and agrees that (i) the plans and specifications for the Unit and the Condominium on file with the applicable governmental authorities may not, initially, be identical in detail to Seller's Plans and Specifications, and (ii) because of the day-to-day nature of the changes described in this Section 14, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, Buyer and Seller both acknowledge and agree: **The Unit and the Condominium may not be constructed in accordance with the plans and specifications on file with applicable governmental authorities. Without limiting the generality of Section 29, Seller disclaims and Buyer waives any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications. Seller has not given and Buyer has not relied on or bargained for any such warranties. In furtherance of the foregoing, in the event of any conflict between the actual construction of the Unit and/or the Building, and that which is set forth on the plans, Buyer agrees that the actual construction shall prevail and to accept the Unit and Building as actually constructed (in lieu of what is set forth on the plans).**

Without limiting the generality of the foregoing, because of Seller's need to coordinate the appearance and design of the overall development of the Condominium, both in connection with the nature and layout of the land on which construction is to take place and of the street, common areas and other features of the development, Buyer understands and agrees: **The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor and building plan of the applicable model and building (as shown in the Condominium Documents or in any illustrations of the model and building); and may be "sited" in a position different from that of the applicable model and floor and building plan (or any such illustrations). Buyer agrees to accept the Unit and the said building as "sited" by Seller and as constructed according to a reverse floor and/or building plan.** This paragraph does not limit the generality of Seller's rights, set out elsewhere in this Agreement, to make other changes in the Unit, the Condominium and the Condominium Documents.

Buyer understands and agrees that in designing the Condominium, the stairwells within the Condominium Property and the Common Areas were intended primarily for ingress and egress in the event of emergency and, as such may be constructed and left unfinished solely as to be functional for said purpose, without regard to the aesthetic appearance of said stairwells. Similarly, the garage and utility pipes serving the Condominium are intended solely for functional purposes, and as such may be left unfinished without regard to the aesthetic appearance of same. The foregoing is not intended to prohibit the use of the stairwells, garage, and utility pipes for any other legal purpose. Further, Buyer hereby acknowledges and agrees that sound and/or odor transmission in a multi-story building such as the Condominium is very difficult to control, and that noises and/or odors from adjoining or nearby units and/or mechanical equipment can often be detected in other units. Without limiting the generality of paragraph 29, Seller does not make any representation or warranty as to the level of sound and/or odor transmission between and among units and the other portions of the Condominium Property, and Buyer hereby waives and expressly releases any such warranty and claim for loss or damages resulting from sound and/or odor transmission. Lastly, Buyer understands and agrees that there are various methods for calculating the square footage of a Unit, and that depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount. Additionally, as a result of in the field construction and other permitted changes to the Unit, as more fully described in this Section, actual square footage of the Unit may also be affected. Accordingly, during the pre-closing inspection, Buyer should, among other things, review the size and dimensions of the Unit. By closing, Buyer shall be deemed to have conclusively agreed to accept the size and dimensions of the Unit, regardless of any variances in the square footage from that which may have been disclosed to Buyer at any time prior to closing. Without limiting the generality of any other provision of this Agreement, Seller does not make any representation or warranty as to the actual size, dimensions or square footage of the Unit. Nothing herein shall be deemed to deny or abridge the rights granted under Section 718.506, Florida Statutes.

Buyer further agrees and understands that trees and landscaping which are located on portions of The Properties may be removed to accommodate construction. Seller does not guaranty the survival of any trees and landscaping which are left or planted on any portion of The Properties.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

15.  **Certain Items and Materials**.  Buyer understands and agrees that the Unit is to be delivered at closing in "basic-finish condition". For purposes of this Agreement, and except as otherwise set forth below, "basic-finish condition" generally means that the Unit will be delivered in a condition where it is ready for decoration and finish by the Buyer after closing, with Seller installing only the following finishes (subject to Seller's reasonable right to make modifications or substitutions and to be selected by Seller in its sole discretion, the "Standard Finishes"): (i) the installation of carpet throughout the Unit (other than kitchens, bathrooms and laundry closets), (ii) the priming and painting of interior walls, (iii) the installation of ceramic tile floors in the kitchen and bathrooms, (iv) the installation of countertops and cabinets in the kitchen, (ix) the installation of bathroom accessories in the bathrooms, including toilet paper holder and towel bar; (xii) the installation of appliances including a refrigerator, cook-top and oven, dishwasher, microwave, washing machine and dryer. Buyer understands and agrees that other than the Standard Finishes, no other furnishings, finishings, finishes or items of personal property will be included with the Unit.

Buyer understands and agrees that certain items such as the following, which may be seen in models (if any) or in illustrations, are not included with the sale of the Unit: wall coverings (including paint other than base primer), accent light fixtures, wall ornaments, drapes, blinds, furniture, knickknacks and other decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, wet bars, intercoms, kitchen accessories, linens, window shades, security systems, certain built-in fixtures, cabinetry, carpets or other floor coverings and colors, wood trim, other upgraded items, balcony treatments (e.g., tile, stone, marble, brick, chattahoochee, scored concrete or wood trim), barbecues, planters, window screens, landscaping and any other items of this nature which may be added or deleted by Seller from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon the models (if any) or shown in illustrations strictly for the purpose of decoration and example only. Items such as these will not be included in the Unit unless specifically provided for in a Rider or Schedule to this Agreement signed by both Buyer and Seller. Certain of these items may not even be available. In the event that Seller does provide any of these or other items, however, Buyer agrees to accept them, although not requested by Buyer, as long as Buyer is not required to pay for such items. There is no obligation for Seller to provide models, but if so provided, the foregoing disclaimers will apply.

Buyer further understands and agrees that certain items, if included with the Unit, such as tile, cabinets, wood, stain, grout, wall and ceiling textures, granite, marble, stone, mica and carpeting, are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturer from those shown in the models or in illustrations or included in Seller's Plans and Specifications or in the published list of standard items (if any). If circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, or if Seller elects to omit certain items, Seller may modify the list of standard features or make substitutions for equipment, material, appliances, etc., with items which in Seller's opinion are of equal or better quality (regardless of cost). Buyer also understands and acknowledges that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor (if any). Buyer recognizes that certain colors as shown in displays or in the models, including, but not limited to, cabinetry, carpeting and wood stain, will weather and fade and may not be duplicated precisely.

If Seller allows Buyer to select certain colors and/or materials in the Unit (which Seller is not obligated to do), Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within fourteen (14) days after the date the list of selections (if any) is made available to Buyer. If these selections (if any) are not delivered to Seller in writing within the time period stated above, then it is agreed and understood that the choices will be made by Seller in Seller's sole discretion.

The agreements and waivers of Buyer contained in this paragraph will survive (continue to be effective after) closing.

16.  **Litigation**.  In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorneys', paralegals and para-professionals fees and court costs at all trial and appellate levels. This paragraph will survive (continue to be effective after) any termination of this Agreement, but shall otherwise be deemed merged into the deed at closing.

17.  **Maintenance Fee**.  Buyer understands and agrees that the Estimated Operating Budgets for the Condominium Association and the Master Association (the "Budgets") contained in the Condominium Documents provide only an estimate of what it will cost to run the Associations during the period of time stated in the Budgets. The Budgets are not guaranteed to accurately predict actual expenditures. Changes in the applicable Budgets may be made at any time to cover increases or decreases in actual expenses or in estimates. It is intended that the

Seller, as the sole Unit Owner upon the formation of the Condominium, will vote not to provide any reserves for the initial year of the Condominium Association. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves. If an election is in fact made to waive reserves, the assessments per unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - Without Reserves". If no such election is made, the assessments per Unit payable to the Condominium Association will be as set forth in the Estimated Operating Budget as "Assessments per Unit - With Reserves".

18. <u>Condominium Association and Master Association</u>. This Agreement is also Buyer's application for membership in the Condominium Association and the Master Association, which memberships shall automatically take effect at closing. At that time, Buyer agrees to accept the liabilities and obligations of membership.

19. <u>Seller's Use of the Condominium Property</u>. As long as Seller owns a unit or units or any other portion of The Properties or Future Development Property and is offering same in the ordinary course of business, it and its agents are hereby given full right and authority to place and maintain on, in and about the Condominium Property, Association Property and/or The Properties (excluding the Unit after closing) model units, sales and leasing offices, administrative offices, signs and lighting related to construction and sales promotion purposes, for such period of time, at such locations and in such forms as shall be determined by Seller in its sole and absolute discretion. Seller, its employees, agents contractors and prospective buyers are also hereby given, for construction and sales promotion purposes, the right of entry upon, ingress to, egress from and other use of the Condominium, Association Property and/or The Properties (excluding the Unit after closing), and the right to restrict and regulate access to the Common Elements, Association Property and/or Common Areas, subject to Buyer's reasonable access to and from the Unit after closing, for the purposes of completing construction of the Common Elements, Association Property, Common Areas and/or other Units within the Condominium and/or The Properties (or proposed within the Future Development Property). Seller's salespeople can show units, the Association Property, the Common Elements, and/or Common Areas, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell, resell or lease Units, Lots or "units" or other portions of any improvements to be constructed upon The Properties or the Future Development Property or develop and manage the Condominium Property, Association Property or other portions of The Properties or the Future Development Property, or to provide management and administration and/or financial services, but Seller's use of said properties must be reasonable, in Seller's opinion, and can't unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This paragraph will survive (continue to be effective after) closing.

20. <u>Sales Commissions</u>. Seller will pay all sales commissions due its in-house sales personnel and/or exclusive listing agent and the co-broker, if any, identified on the last page of this Agreement (if such space is left blank, it shall mean that Seller has not agreed to pay any co-broker and that Buyer represents that there is no co-broker who can claim by, through or under Buyer), provided that such co-broker has properly registered with Seller as a participating co-broker. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement), nor has the sale been procured by any real estate broker, salesperson, agent or finder other than Seller's sales personnel (and the co-broker, if any, named on the last page of this Agreement). Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise. Buyer's indemnity and agreement to hold Seller harmless includes, without limitation, Buyer's obligation to pay or reimburse Seller for all commissions, damages and other sums for which Seller may be held liable and all attorneys' fees and court costs actually incurred by Seller (including those for appeals), regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately wins or loses.

This paragraph will survive (continue to be effective after) closing.

21. <u>Notices</u>. **Whenever Buyer is required or desires to give notice to Seller, the notice must be in writing and it must be sent certified mail, postage prepaid, with a return receipt requested to Seller at 2828 Coral Way, Penthouse Suite, Coral Gables, Florida 33145, Attn: Oasis Project Manager or such other address as Seller may otherwise direct.** Notwithstanding the foregoing, Buyer's notice to cancel pursuant to Paragraph 25 below, may be made in any manner permitted under the Interstate Land Sales, Full Disclosure Act and the regulations promulgated thereunder.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be given either in person, by telephone or in writing and, if in writing, it must be sent either by: (i) certified mail, postage prepaid, with a return receipt requested (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) facsimile transmission if Buyer has indicated a telecopy number on Page 1 of this Agreement; or (iii) a recognized overnight courier service (i.e., Fed Ex, Express Mail, Emory, Purolator, United Parcel Service, etc.), to the address for Buyer set forth on Page 1 of this Agreement.

A change of address notice is effective when it is received. All other written notices are effective on the day they are properly given or mailed, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required specifically in portions of this Agreement.

22. <u>Transfer or Assignment</u>. Buyer shall not be entitled to assign this Agreement or its rights hereunder without the prior written consent of Seller, which may be withheld by Seller with or without cause (and even if Seller's refusal to grant consent is unreasonable). To the extent that Seller consents to any such assignment, said consent may be conditioned in any manner whatsoever, including, without limitation, charging an assignment or transfer fee. Any such assignee must fully assume all of the obligations of Buyer hereunder by written agreement for Seller's benefit, a counterpart original executed copy of which shall be delivered to Seller. If Buyer is a corporation, partnership, other business entity, trustee or nominee, a direct or indirect transfer of any stock, voting interest, partnership interest, equity, beneficial or principal interest in Buyer will constitute an assignment of this Agreement requiring consent. Without limiting the generality of the foregoing, Buyer shall not, prior to closing on title to the Unit, unless first obtaining the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion) advertise, market and/or list the Unit for sale or resale, whether by placing an advertisement, listing the Unit with a broker, posting signs at the Unit or at the Condominium, allowing the Unit to be listed for sale on the internet or the Multiple Listing Service or otherwise.

23. <u>Others Bound by this Agreement</u>. If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving such interest. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If more than one person signs this Agreement as buyer, each will be equally liable, on a joint and several basis, for full performance of all Buyer's duties and obligations under it and Seller can enforce it against either as individuals or together.

24. <u>Public Records</u>. Buyer authorizes Seller to record the documents needed to establish and operate the Condominium, as well as all other documents which Seller deems necessary or appropriate, in the Public Records of Lee County, Florida. Neither this Agreement, nor any notice or memorandum hereof (nor any Lis Pendens), may be recorded.

25. <u>Buyer's Right to Cancel</u>. THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

If Buyer does not cancel this Agreement during this 15-day period, it means that Buyer ratifies this Agreement and the Condominium Documents and Buyer agrees that their provisions are fair and reasonable in Buyer's opinion.

26. <u>Florida Law; Severability.</u> Any disputes that develop under this Agreement will be settled according to Florida law. If any part of this Agreement violates a provision of applicable law, the applicable law will control. In such case, however, the rest of the Agreement (not in violation) will remain in force.

Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part or parts will be unenforceable and considered null and void in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

27. <u>Changes</u>. Seller may make changes in the Condominium Documents in its sole discretion by providing Buyer with all such amendments that are made, provided that, as to these changes, Buyer will have fifteen (15) days from the date of receipt of such changes from Seller which materially alter or modify the offering of the Condominium in a manner adverse to Buyer in which to cancel this Agreement (by delivering written notice to Seller of such cancellation) and receive a refund of any deposits with applicable interest earned, if any. Seller will be

relieved of all obligations under this Agreement when Seller refunds the deposits and interest. Buyer will not be permitted to prevent Seller from making any change it wishes in its sole discretion, nor to pursue any remedy other than the 15-day cancellation remedy described above (and then only for the kind of changes that materially alter or modify the offering in a manner that is adverse to Buyer).

If Buyer has the right to cancel this Agreement by reason of a change which materially alters or modifies the offering of the Condominium in a manner adverse to Buyer, Buyer's failure to request cancellation in writing within the 15-day period will mean that Buyer accepts the change and waives irrevocably Buyer's right so to cancel. All rights of cancellation will terminate, if not sooner, then absolutely at closing. After closing, Buyer will have no remedy for any changes Seller may make or have made.

Without limiting the generality of the foregoing and other provisions of this Agreement, Seller is specifically authorized to: (1) substitute the final legal descriptions and as-built surveys for the proposed legal descriptions and plot plans contained in the Condominium Documents even though changes occur in the permitting stage and during construction, and/or (2) combine and/or subdivide units prior to the recordation of the Declaration (and incorporate divider wall common elements in any such combination units or add common element divider walls in any such subdivision), provided that the percentage share of ownership of common elements of any unit not affected in the combination or subdivision is not affected.

This paragraph will survive (continue to be effective after) closing.

28. <u>Nearby Activities</u>. Buyer understands and agrees that for some time in the future Buyer may be disturbed by the noise, commotion and other unpleasant effects of nearby construction activity and Buyer may be impeded in using portions of the Condominium Property by that activity. Because the Condominium is located in an urban area, demolition or construction of buildings and other structures within the immediate area or within the view lines of any particular Unit or of any part of the Condominium (the "Views") may block, obstruct, shadow or otherwise affect Views, which may currently be visible from the Unit or from the Condominium. Therefore, the Buyer hereby agrees to release Seller, its partners and its and their officers, members, directors and employees and every affiliate and person related or affiliated in any way with any of them ("Seller's Affiliates") from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs, including those incurred through all arbitration and appellate proceedings, related to or arising out of any claim against the Seller or Seller's Affiliates related to Views or the disruption, noise, commotion, and other unpleasant effects of nearby development or construction. As a result of the foregoing, there is no guarantee of view, security, privacy, location, design, density or any other matter, except as is set forth herein or in the Prospectus.

Additionally, inasmuch as the Commercial Lots may attract customers, patrons and/or guests who are not members of the Association or the Master Association, such additional traffic over and upon the Common Elements and Common Areas shall not be deemed a nuisance hereunder.

29. <u>Disclaimer of Implied Warranties</u>. All manufacturers' warranties will be passed through to Buyer at closing. At closing, Buyer will receive the statutory warranties imposed by the Florida Condominium Act.

To the maximum extent lawful, all implied warranties of fitness for a particular purpose, merchantability and habitability, all warranties imposed by statute (except only those imposed by the Florida Condominium Act to the extent they cannot be disclaimed and to the extent they have not expired by their terms) and all other implied or express warranties of any kind or character are specifically disclaimed. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Condominium Property and/or The Properties, the existence of molds, mildew, spores, fungi and/or other toxins within the Condominium Property and/or The Properties, except only those set forth in Section 718.203 of the Act, to the extent applicable and to the extent that same have not expired by their terms. Seller has not given and Buyer has not relied on or bargained for any such warranties, either with respect to any portions of the Condominium Property and/or The Properties.

As to any implied warranty which cannot be disclaimed entirely, all secondary, incidental and consequential damages are specifically excluded and disclaimed (claims for such secondary, incidental and consequential damages being clearly unavailable in the case of implied warranties which are disclaimed entirely above).

Buyer acknowledges and agrees that Seller does not guarantee, warrant or otherwise assure, and expressly disclaims, any right to view and/or natural light.

Further, given the climate and humid conditions in South Florida, molds, mildew, spores, fungi and/or other toxins may exist and/or develop within the Unit, the Condominium Property and/or The Properties. Buyer is hereby advised that certain molds, mildew, spores, fungi and/or other toxins may be, or

if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By executing and delivering this Agreement and closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, spores, fungi and/or other toxins and to have released and indemnified Declarant, Seller and Seller's Affiliates from and against any and all liability or claims resulting from same, including, without limitation, any liability for incidental or consequential damages (which may result from, without limitation, the inability to possess the Unit, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities and/or personal injury and death to or suffered by any of Buyer's Guests as defined below and any other person or any pets). Without limiting the generality of the foregoing, leaks, leaving exterior doors or windows open, wet flooring and moisture will contribute to the growth of mold, mildew, fungus or spores. Buyer understands and agrees that neither Declarant nor Seller is responsible for, and Declarant and Seller hereby disclaim any responsibility for any illness or allergic reactions which may be experienced by Buyer, its pets, its family members and/or its or their guests, tenants and invitees (collectively "Buyer's Guests")as a result of mold, mildew, fungus or spores. It is solely the Buyer's responsibility to keep the Unit clean, dry, well-ventilated and free of contamination.

This paragraph will survive (continue to be effective after) closing.

30. <u>Time of Essence</u>. The performance of all of Buyer's obligations on the precise times stated in this Agreement is of absolute importance and failure to so perform on time is a default, time being of the essence.

31. <u>Return of Condominium Documents</u>. If this Agreement is canceled for any reason, Buyer will return to Seller all of the Condominium Documents delivered to him in the same condition received, reasonable wear and tear excepted. If Buyer fails to return the Condominium Documents, Buyer agrees to pay Seller $50.00 to defray the costs of preparation, printing and delivery of same.

32. <u>Survival</u>. Only those provisions and disclaimers in this Agreement which specifically state that they shall have effect after closing will survive (continue to be effective after) closing and delivery of the deed. All other provisions shall be deemed merged into the deed.

33. <u>Substantial Completion</u>. Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete or substantially complete when so complete or substantially complete in Seller's opinion. Notwithstanding the foregoing, however, neither the Unit nor the Building of which the Unit is a part will be considered complete or substantially complete for purposes of this Agreement unless the Unit (and such portion of the building intended to be used exclusively by Buyer) is physically habitable and usable for the purpose for which the Unit was purchased. The Unit (and such portion of the building) will be considered so useable if the Unit is ready for occupancy and has all necessary and customary utilities extended to it. Other units (and other portions of the building) may not necessarily be so complete and useable.

34. <u>Roadways</u>. Access to the Condominium is via Palm Beach Boulevard which is a two (2) lane 2-way street. The width of Palm Beach Boulevard at that location is approximately thirty (30) feet and is asphalt covered. Palm Beach Boulevard is a public road primarily maintained by the Florida Department of Transportation. You will not be assessed for the maintenance or costs of maintaining Palm Beach Boulevard, except as may be included in your ad valorem tax bills for your Unit.

35. <u>Disclosures</u>. Under the laws of the State of Florida, Buyer is hereby advised as follows:

(a) RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department. The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Units or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Condominium.

(b) CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR UNIT OR CONDOMINIUM. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT, A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET

AND FOLLOWED TO PROTECT YOUR INTERESTS.

(c) BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

36. <u>Representations and Confirmations</u>. Buyer should initial where indicated to evidence its agreement to each of the following:

__JEM__     Buyer acknowledges, warrants, represents and agrees that this Agreement is being entered into by Buyer without reliance upon any representations concerning any potential for future profit, any future appreciation in value, any rental income potential, tax advantages, depreciation or investment potential and without reliance upon any monetary or financial advantage.

__JEM__     Buyer acknowledges and agrees that no such representations, including representations as to the ability or willingness of Seller or its affiliates to assist Buyer in renting or selling the Unit, have been made by Seller, or any of its agents, employees or representatives. Buyer further represents and warrants to Seller that Buyer is entering into this Agreement with the full intention of complying with each and every of the obligations hereunder, including, without limitation, the obligation to close on the purchase of the Unit. Neither Seller, nor anyone working by, through or under Seller, has made any statement or suggestion that Buyer would not be obligated to fully comply with the terms of this Agreement and to close on the purchase of the Unit. Further, Buyer understands and agrees that neither Seller, nor any brokerage company, on-site sales personnel and/or other persons working by, through or under Seller, are under any obligation whatsoever to assist Buyer with any resale of the Unit.

__JEM__     Buyer warrants that Buyer has not relied upon any verbal representations or promises other than as expressly contained herein and in the Condominium Documents, including, specifically, but without limitation, any representations as to potential appreciation in or resale value of the Unit.

__JEM__     Buyer understands and agrees that the Condominium is adjacent to a marina, boatramp and drydock (which may be open to the public), which, in addition to producing the potential for excessive noise and traffic from water vessels and other marina related activities, may contain other establishments offering outdoor music, food and other entertainment events. As a result of the proximity of the Condominium to the marina, boatramp and drydock, pedestrian and vehicular traffic near and around the Condominium may be very heavy and noise from the activities in the public marina may be detectable from the Condominium and create a nuisance. Buyer shall be deemed to have assumed the risks associated with such traffic and potential inconveniences resulting from the proximity to, and activities from, the public marina, and the excessive noise that may result therefrom, and to have fully released the Seller and Declarant from any and all liability resulting from same.

The provisions of this paragraph shall survive the closing.

37. <u>Miscellaneous</u>. The explanations, definitions, disclaimers and other provisions set forth in the Condominium Documents are incorporated into this Agreement as if repeated at length here. When the words "this Agreement" are used, they shall include in their meaning all modifications, riders and addenda to it signed by Buyer and Seller. Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Unit, itself, and not the recreational amenities and other Common Elements. Seller's waiver of any of its rights or remedies (which can only occur if Seller waives any right or remedy in writing) will not waive any other of Seller's rights or remedies or prevent Seller from later enforcing all of Seller's rights and remedies under other circumstances.

38.  <u>Offer</u>.  The submission by Seller of this Agreement to Buyer for examination does not constitute an offer by Seller to Buyer, or a reservation of or option for any Unit in the Condominium.  This Agreement shall not become binding until executed and delivered by both Buyer and Seller.  Upon execution by Seller, an executed copy of this Agreement shall be sent to Buyer, otherwise the firm offer shall be considered rejected and all funds deposited by Buyer shall be promptly returned to Buyer.

39.  <u>Liability</u>.  The liability of Seller under this Agreement or any amendment or any instrument or document executed in connection with this Agreement shall be limited to and enforceable solely against the interest of Seller in the Condominium, and not against any other assets of Seller or any partner of Seller (or its or their officers, principals, directors, employees, managers, members or agents).

40.  <u>Entire Agreement</u>.  This Agreement is the entire contract for sale and purchase of the Unit and once it is signed, it can only be amended by a written instrument signed by the party against whom enforcement is sought which specifically states that it is amending this Agreement.  This Agreement contains the entire understanding between Buyer and Seller.  **Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect.  Buyer has not relied on them.**

*** SIGNATURES CONTAINED ON THE FOLLOWING PAGE ***

GENERAL INFORMATION:

Co-Broker Information: (See paragraph 20 above; if the space for Co-Broker's name is left blank, it shall mean that Seller has not agreed to pay any co-broker)

Co-Broker's Name: Rios Realty Services /marilyn Flanagan
Co-Broker's Sales Agent Marilyn Flanagan
Co-Broker's Address 2645 Executive Park Dr #118
Weston, Florida 33331 USA
Phone No. (954) 815-8766    Fax No. _____
E-Mail _____    License No. 13-4290901

| ANY PAYMENT IN EXCESS OF 10 PERCENT OF THE PURCHASE PRICE MADE TO DEVELOPER PRIOR TO CLOSING PURSUANT TO THIS CONTRACT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER | YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE FIFTEENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT. IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGULATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT MAY BE CANCELED AT YOUR OPTION, FOR TWO YEARS FROM THE DATE OF SIGNING. |
|---|---|

Witnessed by:

Name:_____

Name:_____

BUYER: _[signature]_
Name: Jose Martinez

Name:_____
Date of Signature: 08/01/05

SELLER:
TRG Oasis (Tower Two), Ltd., a Florida limited partnership

By: _[signature]_
Authorized Representative

Date of Acceptance:_____

Name:_____

Name:_____